UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DAVID T. HAGGERTY,

                           Plaintiff,

        -against-                                    1:13-CV-0362 (LEK/RFT)

MICHAEL J. BOYLAN,

                           Defendant.
_____

**MEMORANDUM-DECISION and ORDER**

## I.    INTRODUCTION

        This case concerns the scope of certain provisions of the Financial Industry Regulatory

Authority's ("FINRA") Arbitration Code.  Defendant Michael J. Boylan ("Defendant") sought to

implead Plaintiff David T. Haggerty ("Plaintiff") into an arbitration proceeding before FINRA by

filing a "third-party claim" against Plaintiff in that proceeding.  Dkt. No. 1, Ex. B.  Plaintiff, in

response, brought this action seeking both a declaration that Defendant's third-party claim is not

subject to arbitration under FINRA's Arbitration Code and injunctive relief to that effect.  Dkt. No.

1 ("Complaint").

        On April 2, 2013, Plaintiff moved by order to show cause for a temporary restraining order

("TRO") and preliminary injunction partially enjoining the FINRA arbitration proceeding.  Dkt. No.

6 ("Motion").  The Court held a hearing on the order to show cause on April 5, 2013, and filed a

Decision and Order granting Plaintiff a TRO enjoining arbitration of Defendant's third-party claim

later that day.  Dkt. No. 11 ("April 5 Order").[1]

---

[1] By Decision and Order filed on April 17, 2013, the Court dismissed the Complaint as
against Defendants Mary T. McDowell and Catherine Brannon because the Court's April 5 Order
rendered the Complaint moot as to them.  See Dkt. No. 23 ("April 17 Order").  The Court's April

Although the Court granted Plaintiff a TRO, the Court noted in its April 5 Order that it remained unclear whether Plaintiff was an "associated person" within the meaning of FINRA Rule 13100 when the transactions at issue in the FINRA arbitration proceeding took place. Apr. 5 Order at 8-9. Accordingly, the Court scheduled an evidentiary hearing to clarify Plaintiff's relationship with Defendant's former employer, McGinn Smith & Co ("MS & Co."), at that time. Id. at 10. The evidentiary hearing was held before the Court on the afternoon of April 26, 2013. See Dkt. No. 28.

Currently before the Court is Plaintiff's Motion for a preliminary injunction. Mot. For the following reasons, the Motion is granted.

## II.    BACKGROUND

The Court assumes the parties' familiarity with the factual and procedural background of this case as set forth in the Court's previous Orders. See Apr. 5 Order; Apr. 17 Order; Dkt. No. 28. Here, the Court focuses on the facts adduced at the April 26 evidentiary hearing, during which Plaintiff, Defendant, and the former Controller of MS & Co., David Rees ("Rees"), each testified. See Dkt. No. 30, Ex. A ("Transcript"). Their testimony is summarized below in the order in which it was given and to the extent that it addresses the nature of Plaintiff's relationship with MS & Co.

### A. Plaintiff's Testimony

Plaintiff testified that he was never an officer, director, shareholder, partner, or employee of MS & Co., and that he was never otherwise supervised or instructed by anyone working for MS & Co. Id. at 11:15, 33:18-19, 39:7-40:13, 41:1-4. Plaintiff also testified that he never had an office, desk, cubicle, or any other kind of workspace at MS & Co. Id. at 39:14-16. In addition, Plaintiff denied ever supervising or instructing MS & Co.'s employees or even having the authority to do so.

---

17 Order also extended the TRO for an additional fourteen days, until May 3, 2013. Id. at 5.

2

Id. at 40:19-25.[2]

Plaintiff nonetheless admitted to having a "business relationship" with MS & Co.  Id. at 10:25.  According to Plaintiff, this relationship began in approximately 2000 or 2001 after Plaintiff responded to an advertisement that MS & Co. had placed in a business journal seeking "accountants [and] business people to help [MS & Co.] promote their products."  Id. at 34:11-14, 18-20.  MS & Co. held an open house at an Albany-area country club where David Smith introduced himself and MS & Co. to Plaintiff and approximately 30 or 40 other local business people.  Id. at 34:14-17.  Following the open house, Plaintiff testified that he began to refer clients of his accounting business to MS & Co. in exchange for a "referral fee."  Id. at 11:16-17, 33:20-23, 34:35:7-12.

Over the course of Plaintiff's relationship with MS & Co., Plaintiff testified that he referred approximately seven or eight clients.  Id. at 33:6-8; see also id. at 12:6-15.  And from those clients' investments through MS & Co., Plaintiff testified that he was paid referral fees totaling approximately $60,000.  Id. at 12:2-5.  According to Plaintiff, how MS & Co. paid him referral fees changed over the course of the relationship.  See id. at 13:14-21.  Plaintiff testified that MS & Co. initially paid him a one-time fee on each investment Plaintiff's referral clients made through MS & Co.  Id. at 13:22-14:16, 16:7-19.  That fee equaled a certain percentage of the money MS & Co. earned on each investment.  See id.  At some point in 2002 or 2003, however, MS & Co. began paying Plaintiff's fees in installments of one payment per year for a period of five years.  See id.

---

[2] Defendant attempted to demonstrate Plaintiff's control over MS & Co.'s employees by questioning Plaintiff about his relationship with Richard Feldman, the MS & Co. broker who initially handled Plaintiff's referral account.  Defendant asserted that Plaintiff "got Dave Smith to basically fire Richard Feldman as broker so someone else could have the accounts."  Tr. at 22:25-23:1-2.  However, Plaintiff testified that although he had reported to David Smith that Plaintiff's clients "did not wish to do business with [Feldman] . . . [because] they didn't feel comfortable with him," id. at 22:14-21, Plaintiff "did not get [Feldman] fired," id. at 23:3.

Each yearly payment was smaller than the one-time fee Plaintiff had been paid previously, but when combined, the smaller payments equaled the percentage of MS & Co.'s earnings that the one-time fee had been.[3]  See id.  Plaintiff testified that to the best of his recollection, MS & Co.'s payments to him were made by check or deposited by him into an unspecified account.  See id. at 20:17-21:10.

Plaintiff also testified about his role in referring clients to MS & Co., both generally and in the context of Mary McDowell ("McDowell"), the plaintiff in the underlying FINRA arbitration proceeding.  According to Plaintiff, "[w]henever there was a prospective investor, [MS & Co.] would send [her] the paperwork or [MS & Co.] would give it to [Plaintiff,] and [Plaintiff] would deliver her something or the broker would deliver it and [she] would sign it and send it back."  Id. at 24:6-10.  Although Plaintiff admitted to introducing several of his clients, including McDowell, to MS & Co., Plaintiff denied that he required MS & Co. to send the paperwork for any particular investment to him and not to his clients.  Id. at 21:11-17, 23:18-19, 24:11-23; cf. id. at 27:23-28:16. With regard to McDowell, Plaintiff testified that he did not recall whether he had brought her the paperwork for the investment that is the subject of the FINRA arbitration proceeding or whether MS & Co. had sent McDowell that paperwork directly.  Id. at 23:7-24:1.  Plaintiff denied that he sold McDowell the security in dispute in the arbitration proceeding.  See id. at 33:10-11.

--------

[3] Plaintiff's testimony is unclear as to the exact source and percentage of his fee.  Plaintiff testified that his fee began as ten percent of MS & Co.'s earnings on each investment but increased to thirty percent in 2002 or 2003.  Id. at 14:12-15:8.  Plaintiff also testified that MS & Co.'s *brokers* began to be paid *their* ten percent in installments, as opposed to one-time payments, around the same time, and that Plaintiff shared in those installment payments.  See id. at 17:13-16.  Thus, it is unclear from Plaintiff's testimony alone whether he was paid ten percent or thirty percent (on a one-time basis before 2002 or 2003 or in installments after 2002 or 2003) of MS & Co.'s total earnings on an investment or on the ten percent that was paid to MS & Co.'s brokers.  See id. at 12 ("I was paid . . . as the money was earned by the broker who was working there.").  Whether MS & Co.'s total earnings from an investment and the ten percent paid to the brokers are one and the same is also unclear from Plaintiff's testimony alone.

4

McDowell made the disputed investment with MS & Co. in 2004.  At that time, Plaintiff had been a certified public accountant for over fifteen years, id. at 31:25-32:2, but had not yet become a FINRA-registered securities broker, id. at 35:15-17.  Plaintiff registered with FINRA sometime in the summer or fall of 2005.  Id. at 35:18-22.[4]  From then until Plaintiff terminated his registration in December 2011, Plaintiff worked as a securities broker in the Rockland County, New York office of Money Concepts, a national broker-dealer that Plaintiff testified is not affiliated in any way with MS & Co.  Id. at 37:24-38:22, 39:1-3.  Plaintiff testified that he did not sell securities before he registered with FINRA and that he never worked as a securities broker for any firm other than Money Concepts.  Id. at 36:25-37:3, 38:23-25.

According to Plaintiff, MS & Co. did not pay him any referral fees after he registered with FINRA.  Id. at 41:5-7.  Plaintiff testified that this included portions of fees that he earned before he registered but which came due for payment only afterward, such as portions of the fee he was owed for referring McDowell to MS & Co.  See id. at 29:19-25, 42:14-43:14.

**B. Rees's Testimony**

Rees testified that he was the Controller of MS & Co. from August 2002 to April 2009.  Id. at 49:12-15.  According to Rees, MS & Co. received a ten-percent commission on certain investments made through its brokers.  See id. at 51:10-52:23.  This ten-percent commission was then paid to the MS & Co. brokers responsible for securing the investment in yearly two-percent installments over a period of five years.  See id. at 52:12-23.  The responsible brokers would receive sixty percent of the commission while MS & Co. would retain the remaining forty percent

---

[4] Plaintiff originally was registered with FINRA's predecessor organization, the National Association of Security Dealers ("NASD").  Tr. at 35:23-36:1.  Plaintiff's NASD registration was converted automatically to a FINRA registration when FINRA replaced NASD in approximately 2007.  See id. at 37:4-21.

for profit and overhead.  Id. at 52:4-11.

Rees testified that the payments MS & Co. made to Plaintiff were commissions rather than referral fees.  Id. at 50:9-17.  Rees admitted, however, that his classification of the payments as commissions is based solely on the fact that MS & Co. had assigned Plaintiff a "registered representative number"  an action that Plaintiff had no input in or control over.  Id. at 61:10-62:20. Rees testified further that the records of the payments made by MS & Co. to Plaintiff described the payments as "advisory fees," not commissions, and did so for the entire three-year period covered by the records.[5]  Id. at 57:17-58:14.  Rees also testified that he was not present at any discussions concerning fees to be paid to Plaintiff and that he had not seen any documentation relating to a fee agreement between Plaintiff and MS & Co.  Id. at 59:1-17, 62:22-25.  According to the records, the last payment from MS & Co. to Plaintiff occurred on July 27, 2005.  Id. at 55:13-16.

Finally, Rees testified that to his knowledge, Plaintiff was never an employee of MS & Co.; was never a partner or shareholder of MS & Co.; never had an office at MS & Co.; and had no supervisory authority over anyone at MS & Co.  Id. at 63:6-20.

**C. Defendant's Testimony**

Defendant took the witness stand last to provide his recollection of Plaintiff's relationship with MS & Co.  According to Defendant, when Defendant took over Plaintiff's referral accounts,

---

[5] Rees insisted that MS & Co. paid Plaintiff commissions even though Rees testified that he was aware at the time that Plaintiff was not a FINRA-registered representative of MS & Co. and that such commission payments to Plaintiff were therefore illegal. Tr. at 54:7-10, 60:13-16, 61:1-6. Rees testified to a scheme to avoid regulatory scrutiny in which Plaintiff was paid by a non-broker-dealer affiliate of MS & Co., "M.S. Partners," and the commission payments were referred to as "advisory fees" on MS & Co.'s records.  Id. at 54:13-23, 58:15-21.  In response to Plaintiff's counsel's question why Rees would knowingly participate in this scheme, Rees testified that he participated in it "[b]ecause [he] was the controller of [MS & Co.] and if David Smith instructed [him] to do so, [he] would do what David Smith asked [him] to do."  Id. at 60:20-25.

David Smith instructed Defendant to

> call [Plaintiff] when money was coming due and let him know what was available and that [Plaintiff] would handle the client and recommend or not recommend the investment, and that [Plaintiff] would get 60 percent of the commission, [Defendant] would get 30 percent of the commission, and Richard Feldman, who lost the accounts, would get a small part, 10 percent.

Id. at 68:18-25.  Defendant testified further that for "every single transaction [Defendant] would call [Plaintiff] first, send [Plaintiff] the paperwork, get a verbal order from [Plaintiff] and confirm it with the clients." Id. at 70:7-9.

On cross-examination, Defendant testified that a similar procedure was followed with regard to the transactions in question in the FINRA arbitration proceeding.  Defendant testified that he first brought the relevant investments to Plaintiff's attention because they were similar to McDowell's prior investments through MS & Co. Id. at 77:18-25.  After receiving McDowell's order from Plaintiff, Defendant testified that he spoke with McDowell directly to "re-inform[] her of the risks involved with the products, confirm[] with [Plaintiff] that McDowell wished to invest in the product and confirm[] with McDowell that she in fact wished to make an investment." Id. at 78:10-19, 83:5-13, 84:3-4.  Defendant testified that he "was told that [he] should deal with [Plaintiff] but that [Plaintiff] could not place the orders, [the orders] had to be confirmed with the client." Id. at 79:1-4, 83:20-21.  Finally, Defendant testified that he understood Plaintiff to be McDowell's agent and advisor in the these transactions. Id. at 80:4-6.

## III.    LEGAL STANDARD

In this Circuit, a court will grant a motion for a preliminary injunction only where the party seeking the injunction can show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for

litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary

relief." Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 215 (2d

Cir. 2012) (quoting UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 648 (2d Cir.

2011)) (internal quotation marks omitted).  Preliminary injunctive relief "is an extraordinary and

drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the

burden of persuasion." Moore v. Consol. Edison Co. of N.Y., Inc., 409 F.3d 506, 510 (2d Cir.

2005) (internal quotation marks and citations omitted).

## IV.    DISCUSSION

### A.  Likelihood of Success on the Merits

"[A] party cannot be required to submit to arbitration any dispute which he has not agreed

so to submit." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002).  "In the absence of

an agreement by the parties to submit the matter of arbitrability to the arbitrator, the question of

whether or not a dispute is arbitrable is one for the court." Wachovia Bank, N.A v. VCG Special

Opportunities Fund, 661 F.3d 164, 171 (2d Cir. 2011) (citing First Options of Chicago, Inc. v.

Kaplan, 514 U.S. 938, 943 (1995); Bensadoun v. Jobe-Riat, 316 F.3d 171, 176 (2d Cir. 2003)).

"This principle 'flow[s] inexorably from the fact that arbitration is simply a matter of contract

between the parties.'" Id. (quoting First Options, 514 U.S. at 943).

"FINRA-membership constitutes an agreement to arbitrate disputes under FINRA's rules."

In re Am. Exp. Fin. Advisors Sec. Litig., 672 F.3d 113, 127 (2d Cir. 2011) (citing UBS Fin. Servs.,

Inc. v. W. Va. Univ. Hosps., 660 F.3d 643, 648-49 (2d Cir. 2011)).  The interpretation of FINRA's

arbitration rules "is similar to contract interpretation; the organization's arbitration provision should

thus be interpreted to give effect to the parties' intent as expressed by the plain language of the

provision." Wachovia, 661 F.3d at 171 (citing Bensadoun, 316 F.3d at 176) (internal quotation marks omitted). "The analysis differs from ordinary contract interpretation in that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" Id. (quoting John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 58 (2d Cir. 2001)) (other internal quotation marks omitted). "In general, however, terms such as 'customer' should be construed in a manner consistent with the 'reasonable expectations' of FINRA members." Id. (citing Wheat, First Sec., Inc. v. Green, 993 F.2d 814, 820 (11th Cir. 1993)).

As a preliminary matter, the Court notes that Defendant has repeatedly contended both in the hearings and in his submissions that because the FINRA panel denied Plaintiff's motion to dismiss in the underlying arbitration proceeding, the Court is all but bound to accept FINRA's determination and conclude that Defendant's third-party claim against Plaintiff is arbitrable. See, e.g., Dkt. No. 30 ("Supplemental Brief") at 4. While the Court duly defers to FINRA and its substantial expertise in the complicated workings of the financial industry, Plaintiff is correct in arguing that "the question of whether or not a dispute is arbitrable is one for the court." Wachovia, 661 F.3d at 171. In this case, the presence of a form decision lacking any legal analysis and with a single box checked to deny Plaintiff's motion to dismiss in no way compels the Court to deny Plaintiff's Motion here. Therefore, as it did in its April 5 Order, the Court must independently assess the merits of Plaintiff's arguments.

Plaintiff contends that no portion of FINRA's arbitration rules applies to Defendant's third-party claim against Plaintiff. See generally Dkt. No. 6-2 ("Memorandum"). Rather, Plaintiff asserts that "Boylan's 'Third-Party Claim' against Haggerty is pled as common-law contribution and/or indemnification" and argues that Defendant may not vitiate Plaintiff's right to proceed in a traditional court setting by attempting to implead him into an otherwise arbitrable dispute. Id. at 2.

9

Specifically, Plaintiff insists that the two FINRA sections that compel arbitration    the "Customer Arbitration Code" and the "Industry Arbitration Code"    are inapplicable to Plaintiff.[6] See generally id.  The Court addresses Plaintiff's arguments in turn.

### 1. The Customer Arbitration Code

In the evidentiary hearing and in the subsequent briefing, neither party addressed the potential applicability of the Customer Code to the facts of this case.  See geneally Tr.  As a result, the Court's analysis of this issue remains unchanged from its previous ruling on this matter.  Therefore, for the reasons stated in its April 5 Order, the Court concludes that Plaintiff has demonstrated that he is likely to achieve success on the merits under FINRA Rule 12200.  See Apr. 5 Order at 6-7.

### 2. The Industry Arbitration Code

FINRA Rule 13200(a) provides that "[e]xcept as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among Members; Members and Associated Persons; or Associated Persons."  Rule 13100(o) of the FINRA Arbitration Code defines the term "member" to include

> any broker or dealer admitted to membership in FINRA, whether or not the membership has been terminated or cancelled; and any broker or dealer admitted to membership in a self-regulatory organization that, with FINRA consent, has required its members to arbitrate pursuant to the Code and/or to be treated as members of FINRA for purposes of the Code, whether or not the membership has been terminated or cancelled.

"Associated Person" is defined as "a natural person who is registered or has applied for registration

---

[6] Plaintiff refers to the two sections in question as the "Customer Arbitration Code" and the "Industry Arbitration Code."  Mem. at 8-9.  For ease of reference, the Court adopts these classifications in its discussion.

under the Rules of FINRA" or

> [a] sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA.

FINRA R. 13100(a), (r).

In this case, while Plaintiff concedes that he eventually became a securities broker-dealer and a FINRA member (through his registration with its predecessor, NASD), he contends that he was neither when the transactions in question occurred. Mem. at 9; Tr. at 35:18-22. Plaintiff also testified that he did not apply for NASD/FINRA membership until 2005. Tr. at 35:18-22. As a result, he argues that he does not fall among the class of individuals governed by Rule 13200(a). Mem. at 9. In the alternative, Plaintiff argues that even if he were deemed to be a "member" or "associated person" for purposes of Rule 13200(a), the third-party claim against him does not arise out of his "business activities" and is therefore not subject to arbitration under FINRA. Id. at 9-12.

In the evidentiary hearing and his subsequent Supplemental Brief, Defendant argues that Plaintiff was associated with MS & Co. and was engaged in the sort of dealings regulated by FINRA. Defendant contends that Plaintiff was actually(and unlawfully) employed as a broker by MS & Co. in 2004 and was essentially double-dipping on transactions by acting as an agent for both the seller (MS & Co.) and the buyer (McDowell). See generally Suppl. Br.; Tr. In support of these arguments, Defendant relies on the referral fees that Plaintiff admittedly received from MS & Co. as well as testimony suggesting a business relationship between Plaintiff and MS & Co. See, e.g., Suppl. Br. at 2-4.

Even accepting as true all the testimony adduced by Defendant, however, the Court

concludes that Plaintiff has shown a likelihood of success on the merits. Plaintiff has denied under

oath that in 2004 he was a "sole proprietor, partner, officer, director, or branch manager of a

member, or other natural person occupying a similar status or performing similar functions,"

FINRA R. 13100(a), (r), and Defendant has made no argument that Plaintiff occupied any of these

functions at the time of the transactions in question. See generally Suppl. Br.; Tr. Therefore, in

order to have been an associated person for purposes of FINRA, Plaintiff would have to have been

"a natural person engaged in the investment banking or securities business who is directly or

indirectly controlling or controlled by a member." FINRA R. 13100(a), (r).

Despite Defendant's focus on Plaintiff's alleged broker-like sales activity, whether Plaintiff

was in fact operating in a capacity as an unregulated broker is irrelevant to the Court's inquiry if

control is lacking. The FINRA definition of an associated person explicitly focuses on the

"common-law touchstone of control,"[7] see id., and therefore before the Court could even consider

the buyer/seller distinction, it must first determine that Plaintiff either controlled or was controlled

by MS & Co.[8]

_____

[7] Guerrieri v. Town of Geneva, No. 06-CV-6581, 2009 WL 349287 at *8 (W.D.N.Y. Feb. 9, 2009) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)); accord In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005) ("The element of control often is deemed the essential characteristic of the principal-agent relationship." (citing Meese v. Miller, 436 N.Y.S.2d 496, 499 (App. Div. 1981)); Jack Eckerd Corp. v. Dart Grp. Corp., 621 F. Supp. 725, 732 (D. Del. 1985) (citing Government of Virgin Islands v. Richards, 618 F.2d 242, 244 (3d Cir. 1980)); Restatement (Second) of Agency § 14 ("If the existence of an agency relation is not otherwise clearly shown . . . the fact that it is understood that the person acting is not to be subject to the control of the other as to the manner of performance determines that the relation is not that of agency.").

[8] Indeed, even if the Court were to conclude that the "business activities" at issue here were of the kind regulated by FINRA or were to identify any other merit in Defendant's claim against Plaintiff, any such determinations or holdings would be precluded (as the Court finds that they are) by a lack of a control-based relationship.

Construing Defendant's arguments liberally in light of his *pro se* status, <u>see, e.g.</u>, <u>Sealed Plaintiff v. Sealed Defendant</u>, 537 F.3d 185, 191 (2d Cir. 2008), and considering the testimony through the lens of the exacting standard required to trigger the extraordinary remedy of a preliminary injunction, the Court identifies two possible loci of control in Plaintiff's relationship with MS & Co.: (1) the referral payment arrangement; and (2) the removal of Richard Feldman from certain accounts.  In the record currently before it, however, the Court identifies no basis to find control in the 2004 relationship, much less to determine that Plaintiff has failed to show a likelihood of success or serious questions going to this issue.

First, as to the payments, there is no question that Plaintiff received payments from MS & Co. or that he had some sort of business relationship with that embattled company.  However, regardless of whether these payments are characterized as referral fees or commissions, payments are not sufficient in and of themselves to establish a control relationship.[9]  <u>See, e.g.</u>, <u>Petrosurance, Inc. v. National Ass'n of Ins. Com'rs</u>, 888 F. Supp. 2d 491, 504 n.14 (S.D.N.Y. 2012) ("[W]e are aware of no authority that holds that a payment arrangement is, by itself, sufficient to establish an agency or control relationship."); <u>Koninklijke Nedlloyd BV v. Uniroyal, Inc.</u>, 433 F. Supp. 121, 128 (S.D.N.Y. 1977) ("[T]he mere payment of a commission . . . does not establish an agency relationship.").  The Court finds no facts in the record that might embellish this payment relationship to suggest that MS & Co. exercised control over Plaintiff.

The Court is similarly unconvinced that the removal of Richard Feldman from certain accounts demonstrates that Plaintiff exercised some control over MS & Co.  At the evidentiary

---

[9] Because there is no basis to conclude that mere payment demonstrates control, the Court concludes that what the payments are termed is irrelevant to this inquiry.  Similarly, that MS & Co. ultimately ceased to pay fees does not in and of itself suggest anything other than an end to the business relationship between the parties.

hearing, Defendant contended and sought to procure testimony supporting the claim that Feldman

lost the accounts because Plaintiff had complained to Smith that his clients did not like Feldman.

By this logic, Plaintiff had exercised control over MS & Co. by precipitating a personnel move.

However, by this logic, any time an individual provides feedback to a company's management

about an employee, and management takes subsequent personnel action, the individual giving

feedback has exercised control over management.  This line of reasoning may raise interesting

questions about a legal realist account of economic power,[10] but it also would boldly expand the

definition of an "associated person" under FINRA and render "control" a largely meaningless

limiting term in the statutory definition.  Therefore, the Court rejects such an interpretation.  See

Leocal v. Ashcroft, 543 U.S. 1, 12 (2004) (stating that in interpreting a statute, courts "must give

effect to every word of a statute wherever possible").

    Therefore, the Court concludes that Plaintiff has met his burden and shown a likelihood of

success on the merits of his claim.[11]

### B. Irreparable Harm

    "Being forced to arbitrate a claim one did not agree to arbitrate constitutes an irreparable

harm for which there is no adequate remedy at law."  Voegeli, 405 F. App'x at 552 (citing Merrill

Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003)).  The Court's

determination of irreparable harm therefore is dependent upon an assessment of the merits of

Plaintiff's claims in that if Plaintiff satisfies the merits prong of the injunction analysis, he

---

    [10] See Robert L. Hale, *Coercion and Distribution in a Supposedly Non-Coercive State*, 38
POL. SCI. Q. 470, 474 (1923) (describing contracting as mutually coercive, with a bargaining party's
coercive power necessarily shaped by other social and economic factors and background rules).

    [11] In so ruling, the Court takes no position on the underlying merits of Defendant's third-
party claim against Plaintiff or any other claims relating to the disputed transactions.

necessarily also satisfies the irreparable harm inquiry. Because the Court concludes that Plaintiff has satisfied the merits prong of the preliminary-injunctive-relief analysis, the Court concludes that he also has shown the presence of irreparable harm if emergency relief is not granted.

**V.    CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Plaintiff's Motion (Dkt. No. 6) for a preliminary injunction is **GRANTED**; and it is further

**ORDERED**, that Defendant is **ENJOINED** from arbitrating his third-party claim against Plaintiff, and any arbitration of this claim is **STAYED**. In so ordering, the Court in no way rules on the arbitrability of any other claims currently pending in the underlying FINRA proceeding and stays no claims other than Defendant's third-party claim against Plaintiff; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:    May 3, 2013
          Albany, New York

Lawrence E. Kahn
U.S. District Judge

15